361 So.2d 607 (1977)
Jerry Wayne JACOBS
v.
STATE.
6 Div. 389.
Court of Criminal Appeals of Alabama.
July 26, 1977.
Rehearing Denied August 16, 1977.
*608 Morris S. Dees, Jr., Pamela S. Horowitz and John L. Carroll, Montgomery, for appellant.
William J. Baxley, Atty. Gen., and James S. Ward, Asst. Atty. Gen., for the State.
HARRIS, Judge.
Appellant, Jerry Wayne Jacobs, and his brother, John L. Jacobs, were tried and convicted of murder under Alabama's new Death Penalty Act committed during the course of the robbery of a seventy-nine year old man. They had separate jury trials and the jury in each case fixed punishment at death.
Alabama's new Death Penalty Act, (Act No. 213, Acts of Alabama 1975, page 701, now Title 15, Sections 342(3)-342(11), Code of Alabama 1940, Supplement), was enacted into law by the Legislature in response to the decision of the Supreme Court of the United States in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346. See Appendix. Both appellants raised the constitutionality of Alabama's new Death Penalty Act under the Eighth and Fourteenth Amendments to the Constitution of the United States.
For a clearer understanding of the constitutional issues presented we feel that the facts should be summarized in each case in separate opinions though, of necessity, there will be some overlapping and duplication. The constitutional issue will be treated in the Jerry Wayne Jacobs's case and adopted by reference in the John L. Jacobs's case.
The facts in the instant case reveal that the deceased, Walter Knight, was a retired *609 seventy-nine year old man who lived with his wife in Cullman, Cullman County, Alabama, on July 17, 1976. He was in good health and was fairly active for a man of his age. It was his daily routine to walk to the city of Cullman in the morning and spend the day with friends and walk back home before dark each afternoon, the round trip being approximately two miles. Mr. Knight made his headquarters at the Star Billiard Parlor in Cullman where he played pool and poker. It was generally known that Mr. Knight carried a "good bit" of money with him at all times.
Mrs. Knight testified that on the morning of July 17, 1976, her husband left home at the usual time. Before leaving he gave her $1,000.00 in cash and this was the last time she saw her husband alive. She stated when he left home that morning he was wearing a brownish or grayish looking pair of pants, a tan shirt with a few little stripes, a light brown straw hat with a cloth band and he had on socks and brown Hush Puppies shoes. When her husband did not return home on the evening of July 17, 1976, Mrs. Knight contacted the authorities and reported that her husband was missing. She further testified that the authorities searched for her husband eleven days before his body was found.
The actors in this stark drama resulting in the death of Mr. Knight were Jerry Wayne Jacobs, John L. Jacobs and Thomas Eugene Brown. Jerry Wayne Jacobs lived in Winter Haven, Florida. John L. Jacobs lived in and around Cullman. Thomas Eugene Brown, a nineteen year old youth and the nephew of John L. Jacobs by marriage, lived with his mother at Brighton, Alabama, a small community near Bessemer, Jefferson County, Alabama. Of this trio only John L. Jacobs knew Mr. Walter Knight and had often seen him in the Star Billiard Parlor.
There was testimony from two employees of the Star Billiard Parlor and they testified that Mr. Knight carried large sums of money on his person and that he had a reputation of carrying large sums of money all the time. One of these men stated that he had seen Jerry Wayne Jacobs and John L. Jacobs in the poolroom a few days before Mr. Knight was reported missing.
Thomas Eugene Brown testified that he was with the Jacobs brothers on Thursday and Friday prior to Saturday, July 17, 1976, and they visited several people in Cullman County during this period of time. He said that they were together on Saturday and parked in a parking lot just opposite the Star Billiard Parlor and saw Mr. Knight in the poolroom talking to some man. They were in a 1974 black and white Mercury Marquis automobile and John L. Jacobs was driving this car. Jerry Wayne Jacobs was in front sitting on the passenger side, and Brown was sitting in the back seat. They sat in the automobile at this vantage point for about an hour waiting for Mr. Knight to start his trip home. At this time according to Brown he had about $74.00 on him, John L. had around $15.00 to $20.00, and he did not know whether or not Jerry Wayne had any money. Just before parking in front of the poolroom John L. Jacobs had driven them by Mr. Knight's to show them where he lived.
Brown further testified that finally Mr. Knight emerged from the Star Billiard Parlor and walked down the street to another pool hall and John L. Jacobs drove in that direction to keep Mr. Knight under surveillance. This poolroom was closed and they observed Mr. Knight walk back to the Star Billiard Parlor and John L. then drove back to the parking lot in front of the Star Billiard Parlor to wait for Mr. Knight to come out again and start his trip home. While they were parked this second time, Jerry Wayne told John L., "We're going to get the money today." Brown stated that neither he nor John L. had a weapon but Jerry Wayne had a .22 caliber sawed-off rifle and that Jerry Wayne brought this rifle with him from Florida. Jerry Wayne Jacobs had sawed off the stock and a part of the barrel of the rifle and thus converted it into a handgun which would fire only one time and would have to be reloaded before it would fire again. Jerry Wayne put this weapon under the front seat of the car on *610 the passenger side. While they were waiting for Mr. Knight to come out of the poolroom, Jerry Wayne told his brother and Brown that if they said anything he would kill both of them. According to Brown, John L. told Jerry Wayne that Mr. Knight "usually carried two to three thousand dollars with him."
Finally, around five o'clock p. m. Mr. Knight came out of the poolroom and started walking toward his home. John L. cranked the automobile and started following Mr. Knight. John L. told Jerry Wayne that Mr. Knight liked to play poker, and Jerry Wayne said, "Well, let's get him in a card game." John L. overtook Mr. Knight and stopped the car and told Mr. Knight they would carry him home. Mr. Knight got in the back seat of the automobile and John L. said, "Let's go play some poker Mr. Knight," and Mr. Knight replied, "Okay." John L. Jacobs started driving toward Mr. Knight's home and then suddenly turned the car to the left and headed towards Blount County. When they started towards Blount County Jerry Wayne Jacobs turned around and pointed the sawed-off rifle at Mr. Knight and told him, "I'll blow your damn head off it you make a move." At this point Brown stated that Jerry Wayne looked directly at him and stated, "I'll kill you, too, if you say anything."
Brown further testified that when John L. Jacobs started driving toward Blount County, he heard a "click" and knew that John L. had pushed the automatic door lock which locked all doors to the automobile. As they approached a town named Garden City, Alabama, Jerry Wayne leaned over the back seat and with the weapon still pointed at Mr. Knight, Jerry Wayne took Mr. Knight's wallet from his pocket and also took a deck of playing cards, a glasses case, a pistol permit, some candidate cards, Mr. Knight's Social Security card, and other items from the person of Mr. Knight. He ordered Mr. Knight to take off his shoes and give them to him. After Mr. Knight gave Jerry Wayne his shoes Jerry Wayne pointed the weapon at Mr. Knight and told him to keep quiet and keep his hands in his lap.
According to Brown they kept traveling and eventually got near Country Boy Eddie's place where they made a left turn and got on Old Highway 31 which had been abandoned and which was about a half mile from a bridge in Blount County. At this point Jerry Wayne Jacobs told John L. Jacobs to stop the car and he then ordered all occupants to get out of the car. Everyone got out of the car except Brown who stated that his back was hurting from an old injury. When John L. got out he took the car keys with him. Brown stated that Jerry Wayne Jacobs had the weapon in his left hand and he grabbed Mr. Knight by his left arm and carried him into the woods near the old abandoned highway. About two or three minutes later he heard Mr. Knight yell out, "Please, don't do it." Brown said that Jerry Wayne Jacobs carried Mr. Knight into the woods out of his sight and shortly thereafter he heard gunfire three times. He stated that John L. Jacobs was in Brown's sight when he heard the three shots. Soon after hearing the gunshots, Brown saw Jerry Wayne come out of the woods with the weapon and he was wiping blood off his hands. Brown further stated that the items of personal property which Jerry Wayne had taken from Mr. Knight were on the front floorboard of the car.
Brown further testified that when Jerry Wayne Jacobs got back in the car he looked at him and John L. Jacobs and told them he would kill them if they said anything about what had happened. Brown stated that when appellant came out of the woods and returned to the car he was wearing white slippers and they were wet; that Jerry Wayne wore these white slippers until they traveled almost to the bridge at which point he put the white slippers in a sack with some of the other items he had taken from Mr. Knight and threw the sack out of the car by a viaduct near a super highway. In the sack with the white slippers were a bread sack, a jar of mayonnaise and the cards of a candidate for a political office on the Cullman City Council.
Brown continued to testify that they then went to his home in Brighton, Alabama, *611 and when they arrived there Jerry Wayne Jacobs still had the sawed-off rifle and Mr. Knight's billfold and glasses case. The billfold and the glasses case were thrown under the next door neighbor's house, which was vacant at the time, by Jerry Wayne Jacobs. Jerry Wayne kept the weapon which he used to murder Mr. Knight. According to Brown, Jerry Wayne and John L., while on the trip back to Brighton, split between them approximately $500.00 which Jerry Wayne removed from Mr. Knight's billfold. He stated that he did not get any of this money.
This trio left Brighton the evening of July 17, 1976, and took Jerry Wayne Jacobs's wife to the Greyhound Bus Station in Birmingham to go to their home in Winter Haven, Florida. Brown and the Jacobs brothers then left for New Orleans. Several miles south of Meridian, Mississippi, Jerry Wayne decided it was best to dispose of the death weapon. They stopped at a swampy area and Jerry Wayne threw the weapon in a creek. They continued to New Orleans where they stayed two days and then they went to Galveston, Texas, where they spent one night. From Galveston they went to Phoenix, Arizona where they stayed one night. According to Brown's testimony they were traveling in the same Mercury automobile they had used to carry Mr. Knight on his last ride. He further stated that Jerry Wayne Jacobs paid for their food, gasoline and motel bills during their entire trip, from the money he had taken from Mr. Knight.
From Phoenix, Arizona, they drove to Huntsville, Alabama, and remained in that city two or three days. From Huntsville these three men went to Winter Haven, Florida, to the home where Jerry Wayne's wife was living. Brown testified that while they were in Winter Haven, Jerry Wayne took Mr. Knight's Social Security card, Medicaid card and pistol permit and burned them.
From Winter Haven, Florida, Brown and the Jacobs brothers went to Haynes City, Florida, where Brown got away from the Jacobs brothers by going out a bathroom window at a truck stop. He stated he had tried to get away from Jerry Wayne and John L. while they were in New Orleans by going down Bourbon Street and leaving from there, but Jerry Wayne Jacobs stayed right with him all the time and that he had a pistol. The evidence does not disclose where or when Jerry Wayne secured another pistol after he had disposed of the death weapon in Mississippi on their trip to New Orleans.
After escaping from the Jacobs brothers in Haynes City, Florida, Brown caught a ride with a trucker to Birmingham, Alabama, and went to his mother's home in Brighton, Alabama. He then went to his father's home in Cullman, Alabama, and from there he went to the Cullman Police Department and made a full disclosure concerning the death of Mr. Knight to Lieutenant G. W. Roden and Sergeant Johnny D. NeSmith of the Alabama Bureau of Investigation which is connected with the Department of Public Safety of the State of Alabama. The date was July 28, 1976, eleven days after the shooting death of Mr. Knight. After this conversation with these officers Brown agreed to take them to the place where Mr. Knight was killed by Jerry Wayne Jacobs.
Brown and the officers traveled south on Highway 31 into Blount County, Alabama, and stopped at a point approximately two miles north of I-65 in an area that is known as Old Highway 31 South. This location is in Blount County.
According to Lieutenant Roden they found Mr. Knight's body about one hundred feet east of Old Highway 31 South. The lower portion of the body was lying in a creek and the upper part of the body was lying on the bank of the creek. Along with Lieutenant Roden and Sergeant NeSmith were J. Von Daniels, an investigator with the Cullman County Sheriff's Department, and Cullman County Coroner David Moss. Shortly thereafter Sheriff J. C. Carr of Blount County and the Coroner of Blount County arrived at the scene.
Roden stated that the deceased had on a striped shirt, grayish pants, and socks, but *612 there were no shoes on the feet. Near the body was a small brown straw hat with a cloth band.
Dr. James M. Buttram, a toxicologist with the Alabama Department of Toxicology and Criminal Investigation, was called to the murder scene to perform an autopsy on the body of Mr. Knight. Dr. Buttram's expertise and qualifications were admitted by defense counsel. This witness testified that he performed a postmortem examination on the body found on the creek bank in Blount County, Alabama, on July 28, 1976. He stated that in his professional opinion the cause of death was the result of multiple gunshot wounds delivered in the back of the head. Specifically, there were two gunshot wounds in the back of the head of the victim and either one of gunshot wounds would have killed the victim. He stated that the body was in a marked state of decomposition to the extent that the skull had disarticulated from the cervical spine and was lying in the bottom of the creek.
Dr. Buttram found and recovered two projectiles. One was recovered from inside the victim's skull and the other was discovered on the ground near the deceased's left shoulder where he was lying when the body was found. Dr. Buttram delivered both of the projectiles to Mr. Lawdon Yates, a criminologist in the Birmingham laboratory. During this postmortem examination this witness determined the jawbone was fractured into two pieces with the fracture passing completely through the midfront centerline of the jawbone, separating it into two halves. Dr. Buttram stated that in his opinion the application of some type of blunt force would have been necessary to produce this type of fracture of the jawbone. He further stated the force of the bullet wounds in the head of the deceased would not be associated with the fracture of the jawbone.
Dr. Buttram stated that upon further examination of the body he found a fracture of the right third rib near the margin of the sternum bone which joins the ribs in the middle line of the chest. He also found some scattered hairs still adhering to the deceased's skull and there was a mass of hair lying on the ground above the body corresponding to the point where the head would have been had it not disarticulated.
After taking the officers to the body of Mr. Knight Brown took them to a point about two or three miles on Old Highway 31 South and directed them to the place where Jerry Wayne Jacobs had thrown certain items out of the car. The officers found a bag containing a pair of white shoes, bread wrappers, plastic spoons, eight candidate cards with the name Doug Smith on them, and a jar of Bama Salad Dressing. The chain of possession of these various items was established; the items were introduced into evidence over objection of defense counsel.
The next day, July 29, 1976, Brown and Lieutenant Roden went to Brown's house in Brighton to recover Mr. Knight's wallet and eyeglasses case from the place where Jerry Wayne Jacobs had thrown them. Roden stated that the wallet was found under the house next to Brown's mother's house and the eye glasses case was lying on the ground between the two houses. Roden took possession of these two items and kept them in his exclusive possession until the day of trial. The proper predicate was laid and the wallet and eyeglasses case were introduced into evidence over objections.
A few days after Brown took the officers to the body of Mr. Knight and to the place where Jerry Wayne threw the contents of the bag above mentioned he went with Sergeant Johnny NeSmith and a Deputy Sheriff from Blount County to the place south of Meridian, Mississippi to the precise spot where Jerry Wayne had thrown the death weapon. This place was approximately twelve miles south of Meridian and about 150 yards from Interstate I-59 and near the Chunky River Bridge. There they found the sawed-off .22 caliber rifle used in the murder of Mr. Knight. NeSmith took possession of the weapon which he described as being at one time a .22 caliber semi-automatic rifle. He said the handle, stock and barrel had been sawed off which rendered it no longer a semi-automatic but a single *613 shot weapon as there was no reserve for extra cartridges. As a result of this conversion into a single shot weapon it had to be reloaded each time after it was fired. Stated another way, if this weapon was fired three times on any given occasion, the person firing the weapon would have to make three separate and individual loadings in order to fire the gun three times. After the proper predicate was laid this weapon was introduced into evidence over objections.
Mr. Lawdon Yates testified that he was employed by the Alabama Department of Toxicology and Criminal Investigation. He stated his education, qualifications and experience in firearms identification as well as a ballistics expert. His qualifications were not questioned.
Mr. Yates stated that he received a .22 caliber sawed-off rifle from Sergeant NeSmith and a spent projectile and a lead fragment from Dr. Buttram. He test-fired the weapon and made a microscopic comparison by the use of a special microscope which allows a person to look at two bullets at the same time. The bullets that he test-fired were compared with the evidence bullets he received from Dr. Buttram. He stated that one of the slugs he received from Dr. Buttram was too mutilated to make a comparison, but the other slug was in good condition and he was able to make a microscopic comparison with the good slug and the bullets he test-fired with the .22 caliber sawed-off rifle. Mr. Yates stated that in his opinion the unmutilated bullet he received from Dr. Buttram was fired through the barrel of the .22 caliber sawed-off rifle he received from Sergeant Johnny NeSmith. The bullets received from Dr. Buttram and the test-fired bullets were introduced into evidence over the objections of defense counsel.
Jerry Wayne Jacobs and John L. Jacobs left Haynes City, Florida, after Thomas Eugene Brown made his escape from them, and were apprehended in North Carolina. Upon being returned to Blount County, Alabama, each was interviewed separately by Lieutenant Roden, Sergeant NeSmith and Sheriff Carr of Blount County.
Lieutenant Roden read Jerry Wayne Jacobs the Miranda rights and warnings in the presence of Sergeant NeSmith and Sheriff Carr by reading from a Miranda card. Jerry Wayne responded that he understood his rights and did not want an attorney. He was given a waiver of rights form which he read and signed in the presence of these officers, but stated that he did not wish to make a statement to the officers. At that point he was not further interrogated and was put in a cell in the jail.
John Lewis Jacobs was then brought to the interrogating room and the same procedure was followed. He was given the Miranda rights and warnings and stated that he understood his rights. He was furnished a waiver of rights form and voluntarily signed it in the presence of the three above-named officers. Unlike Jerry Wayne Jacobs, John Lewis told the officers that he did want to make a statement. He too did not want an attorney. This was a question and answer statement and it was tape recorded. We will treat this statement in detail in our opinion in the John Lewis Jacobs's case. After making this statement John L. was returned to his cell in the county jail by the Sheriff.
After putting John L. in his jail cell Sheriff Carr stopped by the cell in which Jerry Wayne Jacobs was incarcerated and told him that John L. had made a statement. The sheriff did not tell Jerry Wayne the contents of the statement made by John L. but only told him that John L. had made a voluntary statement. Jerry Wayne responded by saying, "Well, I'll make one too." Sheriff Carr then took Jerry Wayne back to the interrogation room.
Notwithstanding the fact that Lieutenant Roden had already given Jerry Wayne Jacobs the Miranda rights and warnings and that he had signed a waiver of rights form stating that he understood his rights and did not desire an attorney present, Lieutenant Roden again read Jerry Wayne his constitutional rights. Jerry Wayne then told the officers that he was ready to make a *614 statement. This statement was also in question and answer form and was tape recorded. This tape recorded statement was transcribed and the transcription was compared with the tape and was completely accurate and identical. Jerry Wayne Jacobs read the entire transcription and initialed every page and then signed his name at the end of the statement in the presence of the Sheriff of Blount County and two Deputy Sheriffs of Blount County, i. e. Ann Clowdus and Fred Allcorn who witnessed his signature.
There was a voir dire hearing out of the presence and hearing of the jury and much testimony was taken to determine if the confessory statement was knowingly, voluntarily and intelligently made. It was shown by the testimony of the officers that no threats, promises, rewards or the hope thereof, and no force, pressure or any form of coercion were used by the officers to induce Jerry Wayne Jacobs to make a statement, nor were there any inducements of any kind made to him in exchange for such a statement. At the conclusion of the voir dire hearing the trial court determined that the confession was voluntary.
Back before the jury the State laid the proper predicate and the confessory statement was read to the jury. A copy of the transcript of the tape recorded statement was furnished to defense counsel and the Court requested defense counsel to check the transcript as Lieutenant Roden read the statement to the jury to be certain it was read correctly, and this was done. The statement of Jerry Wayne Jacobs is as follows:
"RODEN: We are starting Friday, July 16th, the Friday before Saturday which is on the 17th. We want to start with that afternoon of that day when you and Eugene Brown and John L. got together at Brighton, what you done and just start off with a statement. If we have any questions, we'll ask them at that time when we get to a point that we don't understand or that you need to clarify for us.
"JACOBS: Well, I called Johnny and, first, I asked Eugene if he knew of any place that I could get any money at. Okay, he said no. So I called John L. and John L. told me yes, he knew somebody that might have some. So, when he come down and we got in the car and we left and we went to, let's see .... what the name of the town is . . . right out .... I don't know exactly what the name is. Anyway, we went to a beer joint there and spent the night there at the beer joint drinking.
"NESMITH: In Huntsville?
"JACOBS: Huntsville, yeah. Beer joint.... drinking on some girl's money. I don't know who she is. And we left from there and was going toward Cullman County and I asked John L. who was it that had the money. And he told me. He said the only thing about it was that if we picked him up, we would have to take him somewhere off and leave him. That was the general idea, just taking him off and letting him go. So when we took him off, took him down the road, was the first time I ever saw the fellow. And I held the gun on him and Eugene took the wallet out of his back pocket. We got out there and John L. said, `We'll walk him down here,' which was off the road. We got down there and John L. told me that if I wasn't going to do it, he was going to do it, regardless. And then I turned and started to walk and Eugene says: `He's gone,' and so I turned back around and shot him. The man fell and me and John L. started back up to the car and Eugene was down there and then Eugene come back up to the car last. That's what happened.
"NESMITH: Did you all stay in Huntsville all Friday night?
"JACOBS: Yes, sir.
"RODEN: Then you came back to Cullman. Whose house did you go to in Cullman?
"JACOBS: We went to Charles Brown's house.
"RODEN: Did you go to anybody else's house? Did you go to Kelly's house?
"JACOBS: No, sir. Kelly, the moonshiner? Yes, sir.
*615 "RODEN: Was that the last house you were at before you came into Cullman that Saturday afternoon?
"JACOBS: Yes, sir.
"RODEN: Now, where did you go to when you got into Cullman? Do you remember where you parked at or anything like that?
"JACOBS: Yes, sir.
"RODEN: Where?
"JACOBS: Right across from the poolroom. The parking lot.
"RODEN: What's the name of the poolroom. Do you know?
"JACOBS: No, sir.
"RODEN: Was it the Star?
"JACOBS: Yes, sir.
"RODEN: The Star Pool Room?
"JACOBS: That's what Johnny called it.
"RODEN: All right. When the old man came out of the poolroom, who said what?
"JACOBS: Johnny said, `That's him.' And I said, `Well, well and good, we'll take him off and leave him.' Eugene says, `Well, he's got a whole pocket full of money cause his pocket is bulging out.' And Johnny said, `Well, we'll follow him;' and so we pulled out and Johnny was doing the driving; and we followed him and he went up and then he turned around and went back in the poolroom. So we sat across the street from there whenever he came across the street and down that .... what do you call thatthe viaduct where the bridge iswhere the railroad track is. And when he come down at the other end, then, Johnny told him `Come on and I'll give you a ride to your house.' And he got in; and then Johnny told me, he says, he looked at me and he said, `It's about time, ain't it?' And I looked around, and I seen where the man lived at. They had done told me that's where he lived. So I pulled the gun on him before, I'd say right after we got to the house.
"RODEN: At his house?
"JACOBS: Yeah.
"RODEN: Do you know where he lives?
"JACOBS: Yeah. Just as we got to his house. I don't know the address, but I can remember the house.
"RODEN: Did you all take a left just before you got to his house and went back to 31.
"JACOBS: Yes, sir.
"RODEN: All right. When you put the gun on him, what did you tell him?
"JACOBS: I told him to hold still.
"RODEN: Give me the exact words, if you can.
"JACOBS: I told him to hold still; not move; not move his hands or else I would shoot.
"RODEN: Why did you tell him not to move his hands?
"JACOBS: Because Johnny told me that he had a .22 pistol in his left pocket, I believe.
"RODEN: Johnny knew that he carried a gun?
"JACOBS: Yeah.
"RODEN: Johnny and John L. are the same two people that we are talking about?
"JACOBS: Right.
"RODEN: Well, after you pulled the gun on him, what did the old man say?
"JACOBS: He thought I was joking. He pushed it back away and I told him: `Well, I'm not joking.' And the old man kept laughing, and Johnny finally broke loose and says, `He's not joking. He'll shoot both of us.' And that way, see, the old man took the hint; and that's when Eugene was frisking his pockets.
"RODEN: Do you know the old man's name?
"JACOBS: No, sir.
"RODEN: You didn't know his name?
"JACOBS: I hadn't never seen him before in my life.
"RODEN: Describe him to me.
"JACOBS: Well, he was old. He had white hair and wore a little `ole brown hat.
"RODEN: A straw hat?
"JACOBS: Yeah.
*616 "RODEN: I'm going to show you a picture; and I want you to tell me if this is the man that you picked up on July 17th?
"JACOBS: Yes, sir.
"RODEN: Is this the man?
"JACOBS: That's the same one.
"RODEN: All right, after you got on 31 highway, you went on down. Do you remember passing anything? Do you remember passing the Top Hat Barbeque in Blount County?
"JACOBS: No, sir.
"RODEN: Do you remember going through Garden City . . . going across the bridge in Garden City?
"JACOBS: No, sir.
"RODEN: Did you notice anything around you on the old deserted road that you were on?
"JACOBS: There was a group of trees down that old highway. There was a lot of trees. That's about the only thing.
"RODEN: All right. Who went to the woods with you when you carried the old man in the woods?
"JACOBS: Me, John L. and Gene.
"RODEN: All three of you went in the woods?
"JACOBS: Yes, sir.
"RODEN: Which arm did you have him by?
"JACOBS: I didn't have him by either arm.
"RODEN: Who had him? Did he walk into the woods by himself?
"JACOBS: Gene was in front; John L. was beside him; and I was behind.
"RODEN: After you got in the woods, there, was there a little creek? Was there any water in the creek?
"JACOBS: Yes, sir.
"RODEN: There was? After you got in the woods there, was there anything said between you three?
"JACOBS: Yes, there was something said between me and John L.
"RODEN: What did you say?
"JACOBS: Gene stopped up on top of the hill; and that's as far as he stopped. I mean, not on top of the hill; but you might say where the branch first starts running on down the side.
"RODEN: All right. After you got down to the branch, you said something awhile ago about the old man running.
"JACOBS: Yeah.
"RODEN: Did he ..... did he start to run?
"JACOBS: I walked off; and John L. told me that if I wasn't going to do it, he was going to do it, regardless; cause he didn't want anybody to identify us.
"RODEN: What?
"JACOBS: Shoot the old man.
"RODEN: Shoot him?
"JACOBS: Yeah. I told him that there wasn't no way; and when I started off, Gene turned around there and says, `He's gone.' And then when I turned back around, I had my ..... had the gun in my hand; and the safety was supposed to have been on itwhich it wasn't; and then I turned and then I fired.
"RODEN: Where did you hit him the first?
"JACOBS: I don't know.
"RODEN: You don't know where you hit him the first time?
"JACOBS: No, I don't.
"RODEN: Where was he at when you hit him the first time?
"JACOBS: Just before he got to the other side of the branch.
"RODEN: Do you know where he was hit in the body? Do you know whether he was hit in the head or in the body or where he was hit?
"JACOBS: No, sir.
"RODEN: What kind of shells were you using?
"JACOBS: .22.
"RODEN: Long?
"JACOBS: Yeah, I believe they was long rifles.
"RODEN: All right. What happened then? Did he fall?
*617 "JACOBS: He went down.
"RODEN: Was he still alive then?
"JACOBS: I think so. I ain't for sure.
"RODEN: Then what happened?
"JACOBS: Well, I come back up the bank; and I handed Gene the gun; and I went up the bank; and John L. come running up the bank; and Gene come after him. And Gene was the last one to come up from the woods.
"RODEN: Who walked across the creek and shot him two more times?
"JACOBS: Well, there was two more shots; but me and John L. was up at the car when there was two more shots fired.
"RODEN: You and John L. were at the car?
"JACOBS: And Gene was the only one that had the gun after I had fired the first shot. And, then, whenever we got up there on the bank, and then Gene come up there laughing like hell and said, `We don't have nothing to worry about.' We sat down in the car. I took the billfold; and I divided the money up between the three of us.
"RODEN: How much money was there?
"JACOBS: There was, I think, pretty close to about six hundred .... maybe seven hundred dollars.
"RODEN: All right, what did you do then? What kind of car were you in?
"JACOBS: A '74 Mercury Marquis.
"RODEN: Who was sitting where in the car? Who was driving the car?
"JACOBS: Johnny drove the car all the way.
"RODEN: Where were you sitting.
"JACOBS: I was sitting on the passenger side of the front seat.
"RODEN: Where was Eugene at?
"JACOBS: He was sitting in the back. I reckon, behind me.
"RODEN: And the old man got in behind John L.?
"JACOBS: Yes, sir. That's the type of car that when somebody gets in it, the driver can lock the door over here; and there is no way that you can unlock it.
"RODEN: After you had fired that shot at Mr. Knight, you said Eugene went down and you heard two more shots. Is that right?
"JACOBS: Yes, sir.
"RODEN: Did Eugene tell you where he shot him at?
"JACOBS: No, sir.
"RODEN: He didn't tell you in what part of the body he had shot the old man?
"JACOBS: No, sir.
"RODEN: All right. After that, where did you go?
"JACOBS: We went riding down the road. We went back to Eugene's mother's. And Johnny gave Eugene's mother some money; and Eugene gave her some money. We loaded up in the car; and we left from there. And some place between Brighton and going down the Interstate going toward Louisiana on 31 going toward Louisiana, one of them places is where Johnny stopped and he says, `We'd better get rid of that gun.' And this creek was setting, well, the banks coming out this way and the creek's setting out toward the side where it looks like cars have been pulling up there. And he stopped and opened up the trunk. I opened up the trunk; and when I started to get out, Eugene had already got out and went back there and got the gun; and we took it to the end of the bank and threw it into the water. Where that place is at.... I don't know the name of it.
"RODEN: What did the old man have in his pockets beside his money and his wallet? Do you remember what color his wallet was?
"JACOBS: It was black.
"RODEN: Black? Did he have anything else in his pocket?
"JACOBS: Social Security card.
"RODEN: Social Security card? Did he have any pictures of candidates running for office, or anything in his pockets, or anything?
"JACOBS: Yes, sir. In his shirt pocket.
*618 "RODEN: Do you remember what the candidate's name was?
"JACOBS: No, sir. I don't remember.
"RODEN: If I were to call the name, would you remember it?
"JACOBS: I might.
"RODEN: Doug Smith? The guy that had glasses on? Do you think that was the card he had in his pocket?
"JACOBS: I ain't for sure; but that might be the card.
"RODEN: When you led the old man . . or when he got out and walked down to the creek, was his shoes still on him then?
"JACOBS: No, sir.
"RODEN: The shoes was not on him?
"JACOBS: No, sir.
"RODEN: Where were they at?
"JACOBS: They was in the car.
"RODEN: They were in the car. Why?
"JACOBS: Johnny told me it would be best. To keep him from running through the weeds or anything, it would be best if he would take his shoes off. And that was way before we went up there. He explained everything before we went up there.
"RODEN: How come your shoes wet?
"JACOBS: My shoes?
"RODEN: Yeah. What kind of shoes did you have on that day?
"JACOBS: I had on a pair of white shoes, I believe. White shoes.
"RODEN: Describe the shoes.
"JACOBS: Just slip-on shoes.
"RODEN: Slip-on? Did they have a buckle on them? Did they slip on; or did they or did they not have a buckle on them? Do you remember?
"JACOBS: No, they did not have a buckle on them.
"NESMITH: After you got back to the car, was your shoes wet?
"JACOBS: Yes, sir.
"NESMITH: How come them wet?
"JACOBS: Well, I was standing in the creek.
RODEN: You were standing in the creek?
"JACOBS: Yeah.
"RODEN: Where was you standing when the first shot was fired? Was you standing on the bank or in the creek?
"JACOBS: I was standing on the bank.
"RODEN: On the bank? Did you eject that hull there, then? Did you pull the bolt back on it?
"JACOBS: No.
"RODEN: You left it in it?
"JACOBS: I left the bolt in the gun.
"RODEN: You didn't eject the hull out after you fired the shot?
"JACOBS: No, sir.
"RODEN: After you got back in the car and started down the highway there, do you know where you were atwhat highway it was?
"JACOBS: Thirty-one.
"RODEN: South?
"JACOBS: Yes, sir.
"RODEN: About how far were you from the Interstate? Do you remember?
"JACOBS: No, sir.
"RODEN: Do you have an idea? After you got back in the car and started back on down the road, did anybody throw anything out of the car?
"JACOBS: Yeah.
"RODEN: Who?
"JACOBS: Gene threw ..... well, he had a bunch of stuff in the back that he had bagged upput in a paper bag; and Johnny thought it would be the best thing to get rid of the shoes.
"RODEN: What?
"JACOBS: He said it would be best if I got rid of them shoes that I had on.
"RODEN: Why?
"JACOBS: Because they were wet. So Gene reached back there and said, `Here. Here is a pair that might fit you.' So I put them on; and I handed him mine; and he *619 put them in the bag. And they all went out the window.
"RODEN: Do you know where you were at when he throwed it out?
"JACOBS: Somewhere on the highway.
"RODEN: How far from where the old man was shot did Gene throw the shoes out?
"JACOBS: I don't know. It might have been a mile something.
"RODEN: What else was in the bag that was thrown out? Do you know?
"JACOBS: No, sir. Not exactly.
"RODEN: Was those candidate cards that was in the old man's pocket in the bag?
"JACOBS: I think so. I'm not for sure.
"RODEN: Was there a jar of salad dressing in the bag?
"JACOBS: Yes, sir.
"RODEN: There was?
"JACOBS: Yes, sir.
"RODEN: What side of the car was it thrown out on? What side of the highway? You were going South. What side of the highway was it thrown out on?
"JACOBS: Well, I believe it was thrown out on the side that I was sitting on.
"RODEN: Did you throw the wallet out then? And the eyeglass case?
"JACOBS: No, sir.
"RODEN: All right. You went from there to Brighton?
"JACOBS: Went by Brighton.
"RODEN: That's where your sister lives. Is that right?
"JACOBS: Right.
"RODEN: Then what happened.
"JACOBS: We went inside; and, first of all, we cleaned out the car. Got everything out of the car; and Gene left that there at his sister's. So, we went and got .... he had the man's wallet; and he had it in his pocket.
"RODEN: Who did?
"JACOBS: Gene had it in his pocket. And Johnny asked him was that the old man's wallet; and he said, `Yeah.' He said it would be best if you got rid of it; so Gene tore it up; and I believe he threw it between the empty house and her house. And the old man's glass case was .... I got that from Gene. I busted the glasses; threw the case to the side of the house there; and that's where the wire frames are at.
"RODEN: All right. Then where did you go? Did you give your wife some money? Are you married?
"JACOBS: Yes, sir.
"RODEN: Did you give your wife some money?
"JACOBS: Yes, sir.
"RODEN: How much money did you give her?
"JACOBS: Seventy dollars.
"RODEN: Seventy dollars. For what?
"JACOBS: I told her I wanted her to catch a bus and go back to Florida; and I would see her whenever I could.
"RODEN: Where did you all go from there?
"JACOBS: From there? We left from there; and we went to
"RODEN: Go through the gun with me just one more time. Now, where was you at when you got rid of the gun?
"JACOBS: I don't know exactly the name of the place. I just know where it was at.
"RODEN: Do you know which State you were in?
"JACOBS: I know where it is on 31.
"RODEN: What happened to the car that you picked the old man up in?
"JACOBS: Eugene sold it to a fellow in his name to a fellow at a car lot.
"RODEN: Where at? Do you know his name?
"JACOBS: I don't know what you call it. Hueytown?
"RODEN: Do you know the man's name that he sold it to?
*620 "JACOBS: No, sir; but he had a mustache; and he gave him two hundred dollars and a green Vega for that car.
"RODEN: At that time was there anything of the old man's still in the car? Or on any of you three? Other than the money?
"JACOBS: That belonged to the man?
"RODEN: That belonged to the man.
"JACOBS: The only thing that belonged to him was these shoes that I had on.
"RODEN: Where are the shoes now?
"JACOBS: They are in Florida.
"RODEN: Where at?
"JACOBS: In a trash pile.
"RODEN: Did you burn anything in a garage in Florida?
"JACOBS: No, sir.
"RODEN: Any identification or anything like that?
"JACOBS: No, sir.
"RODEN: Who was the original owner Who had this gun on, say, on Friday, the 16th of July? Whose gun was it?
"JACOBS: Terry Lee. I think that's his name. He's in the Army now, I think.
"RODEN: Did you get the gun from him?
"JACOBS: No, sir.
"RODEN: Who got the gun from him?
"JACOBS: I told Eugene that I would like to have one, you know, that I could fix up and sell. So, he told me he knew somebody that had one and more than likely, I guess, he paid for it; or the fellow gave it to him. But whatever, I got it. It was about half as long as this table.
"RODEN: When you got it?
"JACOBS: Yes, sir.
"RODEN: How come it was so short? I understand it was short, wasn't it? How come it short?
"JACOBS: I sat down in my sister's house and took a hacksaw and cut it that way.
"RODEN: You cut the barrel and the stock off. Is that right?
"JACOBS: Yes, sir.
"RODEN: Did you all follow the old man there in town? How did you do?
"JACOBS: He didn't .... whenever he come out of the poolroom, he went this way like the bridge was this way going toward the other bridge that goes across. He went this way. He went back up this way. Got to the corner and he looked around the corner. He turned back around and then he walked this way. We drove up this way; turned around and went around a whole block and come back; and when we pulled up this way, the old man was going back to the poolroom; and we went right around and went back to the parking lot. We sat there for around, I'd say, two hours. The old man come out. Johnny cranked up the car; went around this way and went around the block and parked. And he says that he's been watching the old man for a long time; and he went the same routine, went the same way every time he went home. Never changed his routine.
"RODEN: Why hadn't Johnny done hit him before? Got his money and robbed him before?
"JACOBS: Because the person that he was talking to wouldn't help him.
"RODEN: Is that the reason he called you?
"JACOBS: Well, that's the reason ..... well, I called him and asked him if he knew where any money was at. And he said, `Yeah,' so when he came down there, he said, `Well, if I pick him up, it will be too late to chicken out.' So, when it come down to shooting somebody, I told him to just forget about it. Just leave him here. I told him by the time he got to Cullman County, we would be gone. I said he didn't know me from Adam's house cat, anyway.
"RODEN: Was that the reason he called you, though, was because he knew you had enough guts to do it?
"JACOBS: I don't know. I wouldn't know. In fact, in a way, I wish I had never fired the first shot.
"RODEN: Did you have any blood on you at any time?
"JACOBS: No, sir.
"RODEN: Did your shoes have blood on them?
*621 "JACOBS: No, sir.
"RODEN: Did you wipe your hands on anything in the car?
"JACOBS: No, sir.
"RODEN: Did anybody?
"JACOBS: I don't know.
"RODEN: Was the old man ever hit with anything? With a fist or with a rifle butt or anything?
"JACOBS: Not as I know of.
"RODEN: You didn't see it?
"JACOBS: No, sir.
"RODEN: Do you remember what time Mr. Knight was shot? About what time of the evening?
"JACOBS: No, sir. I don't.
"RODEN: Do you remember what time you picked him up? An estimated time?
"JACOBS: I would say aboutIt was late in the afternoon; but I don't know.
"RODEN: Four or five o'clock?
"JACOBS: I'd say about five or maybe six.
"RODEN: How long was it from the time you picked him up `til you fired that shot? Do you remember? About how long? Could you give an estimate of the time?
"JACOBS: I'd say about ..... I don't know. It might have been about fifty or fifty-five minutes.
"RODEN: In other words, he was shot at approximately five fifty-five or six o'clock on the 17th day of July, 1976?
"JACOBS: Yes, sir.
"RODEN: Did Mr. Knight say anything to you after he got out of the car? Did he say anything to you on the way to the area?
"JACOBS: No, sir.
"RODEN: Did he say anything after he got out of the car?
"JACOBS: No, sir.
"RODEN: Did he struggle with you at any time?
"JACOBS: No, sir.
"RODEN: He didn't? Did he say anything after you fired that shot? Did he say, `I'm hit,' or anything?
"JACOBS: No, sir." (Whereupon, there was a brief conference between Mr. Bains and the witness out of the hearing of the Court Reporter, after which the witness continued reading the statement as follows:)
"NESMITH: Did that take place in Blount County?
"JACOBS: Cullman County is in Blount County? Right?
"NESMITH: Cullman is in Cullman County; and Blount is where you all took the body? Where the body was found.
"JACOBS: Yes, sir.
"NESMITH: That was about the 17th, wasn't it?
"JACOBS: Yes, sir.
"NESMITH: At approximately five p. m.?
"JACOBS: Yes, sir. I think it was.
"NESMITH: Where is the barrel to this gun?
"JACOBS: It I ain't mistaken, Eugene's mama put it up somewhere. I don't know.
"NESMITH: Where did you saw it off at?
"JACOBS: At her house.
"NESMITH: Is she your sister?
"JACOBS: Yes, sir.
"NESMITH: Describe the gun in detail to us.
"JACOBS: It's about this long.
"NESMITH: How long did you say that is? Fourteen or fifteen inches?
"JACOBS: Approximately; and it's got one barrel sticking out this way; and it's got a little bolt clip back this way to it; and the handlewhere the stock isis cut off.
"NESMITH: What color is the stock?
"JACOBS: And the barrel is about this long.
"NESMITH: About twelve inches?
"JACOBS: Yes, sir.
"NESMITH: What color is the stock?
*622 "JACOBS: Brown.
"NESMITH: About the color of this door behind me?
"JACOBS: A little bit darker.
"NESMITH: Did it have white tape on it?
"JACOBS: Yes, sir.
"NESMITH: What color of tape? What kind?
"JACOBS: I believe it was white. It was white or black tape.
"NESMITH: Or black?
"JACOBS: Yes, sir.
"NESMITH: He had how much money?
"JACOBS: I'd say about six hundred dollars.
"NESMITH: You had never had any trouble with Mr. Knight before, had you?
"JACOBS: No, sir. I had never seen the man before.
"NESMITH: The picture that Mr. Roden showed you, that is the man?
"JACOBS: Yes, sir.
"NESMITH: He was picked up in Cullman, Alabama?
"JACOBS: Yes, sir.
"NESMITH: You locked the doors on the car where he could not get out?
"JACOBS: Yes, sir.
"NESMITH: Took him into Blount County?
"JACOBS: Yes, sir.
"NESMITH: Near I-65? Parked and got out and shot the man? Is that right?
"JACOBS: We got out and all three of us walked down in the woods. Yes, sir.
"NESMITH: And that's where the old man was killed. Is that right?
"JACOBS: Yes, sir.
"RODEN: What kind of clothes did he have on other than the hat that you mentioned?
"JACOBS: I think he had on a brown coat. I ain't for sure.
"RODEN: What color of shirt?
"JACOBS: A striped shirt.
"RODEN: Do you remember the color of his pants?
"JACOBS: No, sir.
"RODEN: What kind of shoes were they?
"JACOBS: They were brown Hush Puppies.
"CARR: Jerry Wayne, did you say that Mr. Knight didn't say anything from the time you picked him up in Cullman until you left?
"JACOBS: Well, when we picked him up, him and Johnny was talking; but I don't remember what they was talking about. Johnny turned around to me and said, `It's about time.' And when I put the gun on the man, he started laughing; and I told him that if he moved, I would shoot him. Best way was to be still; and he started laughing; and he takes and reaches up like this and pushes the gun away. So, it scared me; and I looked at Johnny; and he said told the old man, `He means it; or he will shoot both of us.' Well, the old man put his hands behind his head and didn't say nothing else.
"CARR: Did you hold the gun on him all the way down to where the shooting taken place?
"JACOBS: No, sir.
"CARR: Did you hold the gun on Mr. Knight all that time?
"JACOBS: No, sir. I had it laying between me and Johnny, and the barrel was pointing toward Johnny; and I had it laying between me and Johnny.
"CARR: Did he ride from Cullman down to where the shooting took place with his hands behind his head?
"JACOBS: No, sir. He put them in his lap.
"CARR: Did he say anything from the time that you took the gun off him up there until you got down to the place where you shot him?
"JACOBS: No, sir.
"CARR: He didn't say anything?
"JACOBS: Well, I asked him how much money did he have; and he said: `Not much.' That's the only question .... I *623 mean, conversation between me and him between there and where we stopped at.
"CARR: Well, after you stopped, from the time before or after ..... immediately after you got out of the car and started down into the woods, did he say anything then? Did he say, `Please don't shoot me' or `Don't kill me'?
"JACOBS: No, sir.
"CARR: He never did say anything?
"JACOBS: No, sir.
"CARR: At any time?
"JACOBS: No, sir. I didn't hear him say anything like that.
"RODEN: Where did you first take the money off him at? Was it when you first picked him up?
"JACOBS: In the car. Yes, sir.
"RODEN: How long after you picked him up did you take the money off him?
"JACOBS: It was about twenty-five minutes after we picked him up.
"RODEN: Do you think you were out of Cullman County when you took the money off him?
"JACOBS: We was on 31.
"RODEN: On 31?
"JACOBS: Yes, sir.
"NESMITH: Jerry, who was it that John L. said he had to help him with something; and you said he backed out?
"JACOBS: I don't know if it was true or not; but he told me it was Sherrell Brown.
"NESMITH: Who?
"JACOBS: Sherrell Brown.
"NESMITH: Sherrell Brown. When you pulled the gun on Walter Knight, isn't it a fact that you asked him for his gun?
"JACOBS: No, sir.
"NESMITH: You knew he had a gun, didn't you? Or thought he did?
"JACOBS: I thought he had one, yeah; cause Johnny told me he had one. But I never asked him about it. Because when I put the gun on him, in the process, Gene was checking his pockets.
"NESMITH: Sherrell Brown knew about this robbery going to come down, didn't he?
"JACOBS: More than likely. I imagine he did; `cause Johnny said he was going to get him to help him and he was aiming .... he said Sherrell didn't want to help him; and he was going to get Mikey Brown to help him; and he said Mikey was too scared to help him. He was afraid Mikey might tell something; so he didn't get neither of them. Neither one wanted to help him.
"NESMITH: Like Officer Roden asked you awhile ago, John L. knew that you had guts enough to go through with it, didn't he?
"JACOBS: Well, he knew that I would hold a gun on him, yeah; and take the money from him. And that was what I was intending to do.
"RODEN: Did John L. tell you about talking to Mikey and Sherrell about this thing?
"JACOBS: Oh, yeah. We carried on a conversation before we left Evelyn's house.
"RODEN: But he set you up on this? He gave you the details about him having a gun and about how much ..... did he tell you how much money that the old man had?
"JACOBS: He said usually the old man carried around from sixteen to seventeen hundred dollars. It would vary on how much it would be.
"RODEN: But there is not any question about John L. telling you about talking with Mikey and Sherrell Brown about this robbery and kidnapping?
"JACOBS: No. No question on it. We did.... we sat down there; and we was talking; and this is way before it happened. And I asked him, I says, `With all the roughnecks up there in Cullman County that's kin to you, you mean you couldn't find anybody?' So he came out and told me, says, `Well, Sherrell . . ..' Him and Sherrell was plotting it; but Sherrell chickened out on him. And he said that he thought that Mikey might. That Mikey said he would go along with it; but Johnny said when it come down to the nitty-gritty, he left.
*624 "This statement was completed on Friday, the 6th day of August, 1976 at 3:17 P.M."
After this statement was read to the jury the State rested its case against this appellant.
Appellant's counsel then made a motion to exclude the State's evidence out of the presence and hearing of the jury. The grounds of said motion were: (1) The only lawful, legal evidence adduced by the State was the evidence of Eugene Brown, an accomplice, and his testimony had not been corroborated as provided by the laws of Alabama; (2) The confession of appellant was obtained in violation of his constitutional rights; and (3) The evidence does not show that the defendant is guilty and the case should not be submitted to the jury. The trial court overruled all grounds stated in the motion to exclude.
The trial court then informed the defendant of his right to testify in his own behalf. Further, that if he chose to remain silent this would create no presumption of guilt and that the prosecuting attorneys could not comment on his failure to testify before the jury. The Court further instructed the defendant that no inference of guilt could be raised by his refusal to take the witness stand. The defendant told the Court that it was his decision not to testify and that the decision was made after consulting with his attorneys, but it was still his own decision. At this point the defense rested.
Aside from the constitutionality of Alabama's New Death Penalty Act appellant claims that the trial court committed several reversible errors during the trial of this case.
Appellant complains that the trial court erroneously charged the jury that malice, one of the key elements of murder in the first degree, could be presumed from the use of a deadly weapon unless the circumstances incident to the killing rebut the presumption. Specifically, appellant contends that the trial court's oral charge that malice could be presumed by the use of a deadly weapon reduced the State's burden of proof as to this element, and, thereby, shifted the burden of proof to appellant.
The appellant relies on Mullaney v. Wilbur, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508. We do not agree with appellant's contention for two reasons. Appellant did not reserve an exception to the oral charge of the Court and, secondly, a careful reading of the Court's charge to the jury makes crystal clear the burden of proof never shifted from the State to the defendant. We will quote pertinent parts from the oral charge to demonstrate that appellant's contention is groundless:
"In this, as in all criminal cases, the defendant is presumed innocent. This presumption of innocence attends him and surrounds him, until the State overcomes it with clear and convincing proof. The State must prove beyond a reasonable doubt that the defendant is guilty. A reasonable doubt is one which appears reasonable to reasonable people and which arises out of the evidence, or the lack of some evidence which you consider material and necessary to establish the defendant's guilt. The State must meet the burden of proof and establish the defendant's guilt beyond a reasonable doubt and to a moral certainty before you can convict the defendant."
* * * * * *
"`Malice' in law does not necessarily mean hate or ill will, but is defined as any unlawful act willfully done, without just cause or legal excuse. It is that state of mind or mental condition which prompts the doing of an unlawful act without legal justification or extenuation. "`Legal malice' as applied to homicide is an intent unlawfully to take the life of another without legal excuse, justification or mitigation. It is not necessarily ill will or hatred. Malice may arise in an instant of time.
"The malice which is an essential element in the offense of murder has always been described as `malice aforethought'. It is descriptive of the state of the mind of the slayer preceding and at the instant of the unlawful act of the killing. Although, for the existence of the malice, no definite or appreciable space of time in law is *625 required to be shown, yet it must be `aforethought', that is, it must be related to the unlawful act in the nature of cause and effect.
"Malice may arise on the instant; and from the use of a deadly weapon, whereby one intentionally takes the life of another, the law raises a prima facie presumption that the killing was done maliciously, unless the circumstances of the killing disprove malice. The intentional and unjustifiable use of a deadly weapon in a deadly manner raises the presumption of malice. This prima facie presumption prevails unless the circumstances incident to the killing rebut the presumption.
"If one person intentionally shoots another with a gun or other deadly weapon, and death ensues, the law implies or presumes malice, and it imposes upon the slayer the burden of rebutting this presumption by other proof, unless the evidence which proves the killing rebuts the presumption.
"Let me repeatthe essential constituents of murder in the first degree are that the taking of life must have been willful, deliberate, malicious and premeditated. These must concur and coexist."
It has been firmly established by both this Court and the Supreme Court of Alabama that in the absence of an exception to the Court's oral charge nothing is presented for review on appeal. The rule applies with equal force under our Automatic Appeal Statute in death cases. Title 15, Sections 382(1), et seq. Code of Alabama 1940. Recompiled 1958. Richardson v. State, 57 Ala.App. 24, 325 So.2d 540; Harris v. State, 56 Ala.App. 301, 321 So.2d 267; Cox v. State, 280 Ala. 318, 193 So.2d 759; Hubbard v. State, 283 Ala. 183, 215 So.2d 261 (Death case); Knight v. State, 273 Ala. 480, 142 So.2d 899 (Death case reversed on other grounds).
In Strong v. State, 52 Ala.App. 237, 291 So.2d 325, this Court held:
"Malice is an essential ingredient of murder. As a general rule, it is an inferential fact not susceptible of positive or direct proof. It arises by inference from other facts proven, and in the trial of cases of homicide is to be drawn by the jury, unless the evidence shows, without room for adverse inference, that the killing was intentional, and was accomplished by the use of a deadly weapon which, as a matter of law, may be pronounced a deadly weapon. Mitchell v. State, 60 Ala. 26; Wallace v. State, 41 Ala.App. 65, 124 So.2d 110; Hackman v. State, 41 Ala.App. 642, 148 So.2d 253; Kemp v. State, 278 Ala. 637, 179 So.2d 762; Brand v. State, 46 Ala.App. 41, 237 So.2d 524; Smith v. State, 47 Ala.App. 513, 257 So.2d 372.
"In Jones v. State, 13 Ala.App. 10, 68 So. 690, the Court of Appeals, per Brown, J., said:
`Where the killing results from the intentional use of a deadly weaponthat is, a weapon which the court may pronounce such as a matter of law, such as a gun or pistol of sufficient caliber and carrying force as to produce deathand the evidence which proves the killing does not at least afford room for an inference rebutting the presumption of malice arising from the use of such weapon, it is then incumbent on the defendant to rebut that presumption by other evidence. If he fails in this burden, the presumption is conclusive against him, and no duty devolves upon the trial court to instruct the jury on any degree of homicide less than murder. Gafford v. State, 125 Ala. 1, 28 So. 406; Hornsby v. State, 94 Ala. 55, 66, 10 So. 522; Hadley v. State, 55 Ala. 31, 37; Mitchell v. State, supra; Gibson v. State, 89 Ala. 121, 8 So. 98, 18 Am.St.Rep. 96; Rogers v. State, 117 Ala. 9, 22 So. 666.'"
We hold the trial court's oral charge to the jury on the presumption of malice from the use of a deadly weapon was correct in every respect. Jones v. State, quoted in Strong, supra.
Appellant strongly urges that the trial court erred in sustaining the State's challenge for cause juror Mary Ruth Martin on the basis of her answers to questions *626 propounded to her with reference to her fixed convictions against the death penalty and circumstantial evidence.
From the record:
"THE COURT: Are there any of you whose attitude towards the death penalty will prevent you from making an impartial decision as to the defendant's guilt? In other words, you are to pass on the guilt or innocence of this defendant. Knowing the penalty, would your attitude toward the death sentence influence your verdict as to determining whether or not the defendant was guilty or innocent.
"Any of you that fall in that category, please stand and
"A JUROR: I'm Mary Ruth Martin; and I don't think I could sit on it if there's a death penalty. Anything but that.
"MR. BAINS: I'm sorry, Judge. I didn't get her name.
"THE COURT: Mary Ruth Martin.
"MR. BURTTRAM: Judge, we challenge Mrs. Martin for cause.
"MR. NESMITH: And we object to any challenge on the part of the State of Alabama of Mary Ruth Martin on the grounds as stated in this Court on the qualification of this jury.
"THE COURT: Mrs. Martin, do you think that, with your attitude toward the death penalty, that you could not vote guilty
"MRS. MARTIN: I certainly do. I would have to say that I do not think I could vote for the death penalty. I really don't; because I'm a mother.
"THE COURT: All right. She states that she could not vote guilty under
"MR. BURTTRAM: We renew our challenge, Judge.
"THE COURT: All right. Sustain the challenge.
"MARY RUTH MARTIN ON VOIR DIRE EXAMINATION BY MR. WALKER:
"Q. Mrs. Martin, do you still reside on Star Route East, Blountsville?
"A. No. Route 2.
"Q. Route 2, Blountsville?
"A. Yes, sir.
"Q. And I believe your husband's name is John?
"A. Yes, sir.
"Q. What type work does he do, please, ma'am?
"A. He works for Goldonrod.
"Q. And do you still work?
"A. Blount Manufacturing.
"Q. Do you believe in the death penalty?
"A. No ....... not really.
"Q. Not really. What do you mean by that?
"A. I don't believe I would be the person to say I should take someone else's life. I don't think I could live with myself.
"Q. Do you feel that you could serve on a jury where, if the defendant was found guilty, the only possible verdict would be the death penalty?
"A. No. I don't.
"MR. WALKER: I believe that's all.
"ON VOIR DIRE EXAMINATION BY MR. BURTTRAM:
"Q. Mrs. Martin, if the evidence .... are you telling us that if the evidence was such that we provedthe State proved to a certainty that a crime had been committed, you could not, then, return the death verdict?
"A. No. If I saw someone wantonly kill someone, then I could say; but
"Q. The only way you
"A. the evidence, I could not.
"Q. You just don't believe in circumstantial evidence?
"A. No, sir.
"Q. And the only way you could return a verdict of guilty that exacted the death penalty would be that you saw the crime
"A. That I saw the crime committed.
Yes, sir. Then I could.
"Q. That is absolutely the only way you could?
"A. Yes, sir. That's the only way I would return one.
"MR. BURTTRAM: Your Honor, we would challenge this witness for cause.

*627 "MR. NESMITH: Your Honor, we object to it. The witness has testified based on the evidence as to what she would do; and I don't know what the evidence is going to be; and neither does the witness; and neither does the ultimate jury in this case.
"THE COURT: Let me ask you this, Mrs. Martin. Is your attitude toward the death penalty such that it would prevent you from making an impartial decision?
"A. I think so, Your Honor.
"THE COURT: All right.
"MR. BAINS: We challenge, Your Honor.
"THE COURT: Sustain the challenge.
"MR. NESMITH: We reserve an exception to the Court's ruling.
"THE COURT: All right."
The above quoted testimony clearly shows that Mrs. Martin's convictions and attitude toward the death penalty would have prevented her from being impartial.
In Williams v. Wainwright, 427 F.2d 921, the 5th Circuit Court of Appeals stated:

"Witherspoon stands for the limited proposition that the State cannot challenge a venireman for cause merely because he said he was `opposed to capital punishment' or indicated that he had `conscientious scruples against inflicting it.' At the same time the Supreme Court was very careful to point out that the state had an equal right to an impartial jury. Therefore, the state still has the right to challenge any venireman that demonstrates his view of capital punishment would either prevent him from finding the defendant guilty or prevent him from imposing the death penalty."
We conclude that the trial court was correct in sustaining the State's challenge to juror Martin. Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776; Seibold v. State, 287 Ala. 549, 253 So.2d 302; Hubbard v. State, 285 Ala. 212, 231 So.2d 86.
The trial court gave a thorough and comprehensive oral charge to the jury, and also gave every written charge requested by counsel for appellant. At the conclusion of the oral charge both the State and the defense announced, "Satisfied."
The jury returned a verdict as follows: "We the jury find the defendant Jerry W. Jacobs guilty of first degree murder with aggravated circumstances as charged in the indictment, and we fix the punishment at death."
Defense counsel requested the Court to poll the jury which request was granted and each juror answered that it was his or her verdict.
From the record:
"THE COURT: Mr. Jacobs, you have heard the verdict of the jury finding you guilty as charged in the indictment and fixing your punishment at death.
"Is there anything you wish to say at this time?
"THE DEFENDANT: I didn't shoot the man, is all I can say. At least I didn't kill him, anyway.
"THE COURT: On the verdict of the jury, the Court adjudges and finds you guilty; and it is the judgment of the Court that you are guilty of first degree murder during a robbery when the victim was intentionally killed, as set forth in Section 2(6) of Act Number 213 of the Acts of the Legislature of Alabama in 1975 Regular Session.
"Under the Act referred to the Court is required to hold a hearing to determine whether or not you shall be sentenced to death or to life imprisonment without parole. No time is set as to when this hearing is to be held."
The Court and counsel for both sides entered into a discussion as to the date to hold such hearing. The date was tentatively set for October 14, 1976. The Court made known to the defendant that the actual sentencing would not take place until after the hearing on October 14, 1976.
At the hearing on October 14, 1976, no evidence was presented by either side but there were lengthy legal arguments. The Court made the following written findings:

*628 "In accordance with law, the Court held a hearing on October the 14th, 1976, to determine whether or not the defendant would be sentenced to death in accordance with the verdict of the jury or be sentenced to life imprisonment without parole.
"The defendant was present with his attorneys Honorable Carl NeSmith and Honorable B. K. Walker, Jr. Considerable argument was advanced with reference to legal questions; but no evidence presented as to mitigating or extenuating circumstances to cause the Court to change the verdict of the jury. The State of Alabama was represented by Honorable Fitzhugh A. Burttram, District Attorney.
"The Court is under an obligation to make findings in this case. The evidence presented in the trial of this defendant is fairly fresh in the mind of the Court as the trial was completed on September the 29thjust about two weeks ago.
"The Court finds from all of the evidence and the jury's verdict that the defendant was guilty and is guilty; and, as stated at the presentation of the jury verdict, the Court adjudged and found the defendant guilty of First Degree Murder committed during a robbery when the victim was intentionally killed. This capital felony has all the ingredients of First Degree Murder; and the jury was charged on First Degree Murder with all its ingredients and elements.
"The Court finds that the capital felony of First Degree Murder was intentionally committed by this defendant while the defendant was engaged in a robbery of his victim.
"The Court further finds that this capital felony of First Degree Murder was intentionally committed by the defendant for the purpose of avoiding or preventing a lawful arrest, in that the evidence showed that the defendant's brother was an accomplice in this crime and that the defendant's brother was known to the victim and, had the victim not been killed, in all probability he would have brought about the arrest of the defendant's brother and, possibly, of the defendant.
"The Court further finds that this capital felony of First Degree Murder was especially heinous, atrocious and cruel. The evidence shows that the defendant and two companions induced a seventy-nine year old man into getting into a car with them and that they carried him out to the woods; made him take off his shoes so that he could not run; led him out through the woods; and, although he was begging and pleading, that this defendant himself did the killingkilled him by a means that was especially heinous, atrocious and cruel.
"This Court finds all of those aggravating circumstances to be present in this case and finds no reason to change the verdict of the jury fixing the punishment at death.
"This the 14th day of October, 1976."
The Court formally sentenced the defendant to death by electrocution on Friday, December 10, 1976, but this sentence was suspended pending an automatic appeal to this Court.
We turn now to determine whether Alabama's new Death Penalty Act (See Appendix) meets the concerns expressed in Furman v. Georgia, supra, and passes constitutional muster when measured by the pronouncements of the Supreme Court of the United States in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929; and Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913.
We start with the statement that since Furman, Alabama has narrowed the category of crimes for which the death penalty may now be imposed and there are many safeguards to insure that the sentence of death will no longer be wantonly or freakishly imposed. It contains provisions for informed, focused, guided and objective inquiry into the question whether an individual should be sentenced to death and effectively reduces "a substantial risk that it will be inflicted in an arbitrary and capricious manner."
*629 Under Alabama's new law, murder, with aggravation, which must be alleged in the indictment, is the only crime for which the death penalty can be imposed, and there are no lesser included offenses. The aggravated offenses are:
"(a) Kidnapping for ransom or attempts thereof, when the victim is intentionally killed by the defendant.
(b) Robbery or attempts thereof when the victim is intentionally killed by the defendant.
(c) Rape when the victim is intentionally killed by the defendant; carnal knowledge of a girl under 12 years of age, or abuse of such girl in an attempt to have carnal knowledge, when the victim is intentionally killed by the defendant.
(d) Nighttime burglary of an occupied dwelling when any of the occupants is intentionally killed by the defendant.
(e) The murder of any police officer, sheriff, deputy, state trooper, or peace officer of any kind, or prison or jail guard, while such prison or jail guard is on duty, or because of some official or job-related act or performance of such officer or guard.
(f) Any murder committed while the defendant is under sentence of life imprisonment.
(g) Murder in the first degree when the killing was done for a pecuniary or other valuable consideration, or pursuant to a contract or for hire.
(h) Indecent molestation, or an attempt to indecently molest a child under the age of 16 years, when the child victim is intentionally killed by the defendant.
(i) Wilful setting off or exploding dynamite or other explosive under circumstances now punishable by Title 14, section 123 or 124, Code of Alabama 1940, when a person is intentionally killed by the defendant because of said explosion.
(j) Murder in the first degree wherein two or more human beings are intentionally killed by the defendant by one or a series of acts.
(k) Murder in the first degree where the victim is a public official or public figure, and the murder stems from or is caused by or related to his official position, acts, or capacity.
(l) Murder in the first degree committed while defendant is engaged or participating in the act of unlawfully assuming control of any aircraft by use of threats or force with intent to obtain any valuable consideration for the release of said aircraft or any passenger or crewman thereon, or to direct the release of said aircraft or any passenger or crewman thereon, or to direct the route or movement of said aircraft, or otherwise exert control over said aircraft.
(m) Any murder committed by a defendant who has been convicted of murder in the first or second degree in the twenty years preceding the crime.
(n) Murder when perpetrated against any witness subpoenaed to testify at any preliminary hearing, trial or grand jury proceeding against the defendant who kills or procures the killing of witness, or when perpetrated against any human being while intending to kill such witness."
Title 15, Section 342(5) provides:
"Hearing as to imposition of death penalty or life sentence without parole after conviction; admissibility of evidence; right of state and defendants to present arguments.If the jury finds the defendant guilty of one of the aggravated offenses listed in section 342(4) hereof and fixes the punishment at death, the court shall thereupon hold a hearing to aid the court to determine whether or not the court will sentence defendant to death or to life imprisonment without parole. In the hearing evidence may be presented as to any matter that the court deems relevant to sentence, and shall include any matters relating to any of the aggravating or mitigating circumstances enumerated in sections 342(8) and 342(9) of this article. Any such evidence which the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay *630 statements; and further provided that this section shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the state of Alabama. The state and the defendant, or his counsel, shall be permitted to present argument for or against the sentence of death. (1975, No. 213, § 3, effective March 7, 1976.)"
Title 15, Section 342(6) (a) and (b) provides:
"Determination of sentence by court; court not bound by punishment fixed by jury.Notwithstanding the fixing of the punishment at death by the jury, the court after weighing the aggravating and mitigating circumstances may refuse to accept the death penalty as fixed by the jury and sentence the defendant to life imprisonment without parole, which shall be served without parole; or the court after weighing the aggravating and mitigating circumstances, and the fixing of the punishment at death by the jury, may accordingly sentence the defendant to death. If the court imposes a sentence of death, it shall set forth in writing as the basis for the sentence of death, findings of fact from the trial and the sentence hearing which shall at least include the following:
"(a) One or more of the aggravating circumstances enumerated in section 342(8) of this title, which it finds exists in the case and which it finds sufficient to support the sentence of death, and
(b) Any of the mitigating circumstances enumerated in section 342(9) of this title which it finds insufficient to outweigh the aggravating circumstances. (1975, No. 213, § 4, effective March 7, 1976.)"
The aggravating and mitigating circumstances are contained in Title 15, Sections 342(8) and 342(9), and provide:
"§ 342(8). Aggravating circumstances. Aggravating circumstances shall be the following:
"(a) The capital felony was committed by a person under sentence of imprisonment;
(b) The defendant was previously convicted of another capital felony or a felony involving the use or threat of violence to the person;
(c) The defendant knowingly created a great risk of death to many persons;
(d) The capital felony was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, rape, robbery, burglary, or kidnapping for ransom;
(e) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;
(f) The capital felony was committed for pecuniary gain;
(g) The capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws;
(h) The capital felony was especially heinous, atrocious or cruel. (1975, No. 213, § 6, effective March 7, 1976.)
"§ 342(9). Mitigating circumstances. Mitigating circumstances shall be the following:
(a) The defendant has no significant history of prior criminal activity;
(b) The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance;
(c) The victim was a participant in the defendant's conduct or consented to the act;
(d) The defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor;
(e) The defendant acted under extreme duress or under the substantial domination of another person;
(f) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired;
(g) The age of the defendant at the time of the crime. (1975, No. 213, § 7, effective March 7, 1976.)"
*631 The new act further provides that death sentences are automatically reviewed "as now required by law." Title 15, Section 382(1) et seq. Code of Alabama 1940 (Recomp.1958).
A careful reading of Alabama's new Death Penalty Act clearly demonstrates that it is not a mandatory act. The jury's function is only to find guilt or innocence. The jury is not the sentencing authority. Although the statute provides that if the jury returns a verdict of guilty it must fix the punishment at death, the question of punishment and sentencing does not end at that point. The verdict of the jury is advisory only, as the law compels the trial judge to hold a separate hearing to consider the aggravating and mitigating circumstances specified in the statute. It is only after this hearing that the trial judge can impose the death sentence or sentence the prisoner to life imprisonment without parole. The trial judge is the sentencing authority and he must make a written finding of one or more of the statutorily defined aggravating and mitigating circumstances and consider any evidence offered by either side as well as the legal arguments advanced by either side. If the trial judge, in his written findings, determines that one or more aggravating circumstances attended the offense charged, then, and only then, can he impose the death sentence. This is a new sentencing procedure embodied in Alabama's new Death Penalty Statute and, in our opinion, meets the concerns expressed in Furman and passes constitutional muster when measured by the pronouncements in Gregg, Jurek and Proffitt, supra. This procedure surely serves to assure that the sentence of death will not be wantonly or freakishly imposed, and squares with the constitutional standards enunciated by the Supreme Court of the United States in the post Furman death cases upheld by that Court.
A heavy burden rests upon those who attack a legislative enactment on the ground that it is unconstitutional.
In Gregg, supra, the Court held:
"Therefore, in assessing a punishment selected by a democratically elected legislature against the constitutional measure, we presume its validity. We may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved. And a heavy burden rests on those who would attack the judgment of the representatives of the people.
"This is true in part because the constitutional test is intertwined with an assessment of contemporary standards and the legislative judgment weighs heavily in ascertaining such standards. `[I]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently to the moral values of the people.' Furman v. Georgia, 408 U.S. at 383, 92 S.Ct. [2726] at 2800 [33 L.Ed.2d 346] (Burger, C. J., dissenting). The deference we owe to the decisions of the state legislatures under our federal system, id., at 465-470, 92 S.Ct. [2726] at 2842-2844 [33 L.Ed.2d 346] (Rehnquist, J., dissenting), is enhanced where the specification of punishment is concerned, for `these are peculiarly questions of legislative policy.' . . . Caution is necessary lest this Court become, `under the aegis of the Cruel and Unusual Punishment Clause, the ultimate arbiter of the standards of criminal responsibility . . . throughout the country.'". . .
In upholding the death statutes in Georgia, Florida and Texas the United States Supreme Court recognized that those statutes contained provisions for informed, focused, guided and objective inquiry into the question whether an individual should be sentenced to death.
In Proffitt v. Florida, supra, the Court said:
"Florida, like Georgia, has responded to Furman by enacting legislation that passes constitutional muster. That legislation provides that after a person is convicted of first-degree murder, there shall be an informed, focused, guided, and objective inquiry into the question whether he should be sentenced to death. If a death sentence is imposed, the sentencing authority *632 articulates in writing the statutory reasons that led to its decision. Those reasons, and the evidence supporting them, are conscientiously reviewed by a court which, because of its statewide jurisdiction, can assure consistency, fairness, and rationality in the evenhanded operation of the state law. As in Georgia, this system serves to assure that sentences of death will not be `wantonly' or freakishly imposed." . . .
The Death Penalty Act in Alabama is strikingly similar to the one upheld by the Supreme Court in Proffitt v. Florida, supra. In Florida, the jury decides first the guilt or innocence of the defendant. Then, in a separate hearing, the jury determines the sentence after considering and weighing statutorily defined aggravating and mitigating circumstances. Under Florida's system the sentence can be death or life imprisonment. However, the verdict of the jury is only advisory as the actual sentence is determined by the trial judge.
In Proffitt the Supreme Court of the United States held:
"The basic difference between the Florida system and the Georgia system is that in Florida the sentence is determined by the trial judge rather than by the jury. This Court has pointed out that jury sentencing in a capital case can perform an important societal function, Witherspoon v. Illinois, 391 U.S. 510, 519 n. 15, 88 S.Ct. 1770, 1775, 20 L.Ed.2d 776, but it has never suggested that jury sentencing is constitutionally required. And it would appear that judicial sentencing should lead, if anything, to greater consistency in the imposition at the trial court level of capital punishment, since the trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases."
Appellant claims that Alabama's new statutory scheme in determining death sentences is constitutionally infirm under Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944, and Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974. These two cases are clearly distinguishable from the instant case in that Alabama's new Death Penalty Act is not mandatory, but, as we have pointed out, is advisory only. Before a death penalty can be imposed in Alabama the trial judge is compelled to hold a separate hearing and make written findings of one or more of the aggravating circumstances set forth in the Act. If the trial judge fails to find one or more aggravating circumstances, supported by the evidence, he is empowered to alter the verdict of the jury and sentence the defendant to life imprisonment without parole. Since the verdict of the jury is not binding on the trial court the Act cannot under any construction be classed as mandatory.
This is the first case under Alabama's new Death Penalty law to reach appellate review and unlike Georgia, Florida and Texas we have no other cases with which we can compare the sentencing procedure to assure the consistency in the sentencing process. But that is not to say that we are without standards and guidelines to follow.
Title 15, Section 382(10), Code of Alabama 1940 (Recomp.1958), provides as follows:
"Hearing and determination in appellate court.In all cases of automatic appeals the appellate court may consider, at its discretion, any testimony that was seriously prejudicial to the rights of the appellant, and may reverse thereon even though no lawful objection or exception was made thereto. The appellate court shall consider all of the testimony and if upon such consideration is of opinion the verdict is so decidedly contrary to the great weight of the evidence as to be wrong and unjust and that upon that ground a new trial should be had, the court shall enter an order of reversal of the judgment and grant a new trial, though no motion to that effect was presented in the court below. (1943, p. 219, § 10, appvd. June 24, 1943.)"
Since the adoption of the Automatic Appeal Act in 1943 the Supreme Court of Alabama has reviewed approximately ninety-five *633 death cases and has reversed twenty-five of them for various reasons, including excessive punishment, and where the verdict was contrary to the great preponderance of the evidence. Easley v. State, 246 Ala. 359, 20 So.2d 519; Davis v. State, 245 Ala. 589, 18 So.2d 282.
The aggravating and mitigating circumstances contained in Alabama's new Death Penalty Act are identical to those in the Florida Act and we adopt the construction of the Florida Court on its interpretation and meaning of "The capital felony was especially heinous, atrocious, or cruel."
In State v. Dixon, 283 So.2d 1, the Supreme Court of Florida held:
"The aggravating circumstance which has been most frequently attacked is the provision that commission of an especially heinous, atrocious or cruel capital felony constitutes an aggravated capital felony. Fla.Stat. § 921.141(6)(h), F.S.A. Again, we feel that the meaning of such terms is a matter of common knowledge, so that an ordinary man would not have to guess at what was intended. It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital feloniesthe conscienceless or pitiless crime which is unnecessarily torturous to the victim."
The trial court's written findings supporting the imposition of the death sentence listed the following as aggravating circumstances:
1. That the capital felony of First Degree murder was intentionally committed by appellant while he was engaged in the robbery of his victim.
2. That the capital felony was intentionally committed by appellant for the purpose of avoiding or preventing a lawful arrest.
3. That the capital felony was especially heinous, atrocious and cruel.
The Court, under the evidence, could have added as one of the aggravating circumstances, that the homicide was committed for pecuniary gain.
We have carefully read, and reread, the entire testimony in this case. The tendencies of the evidence, and all reasonable inferences legitimately drawn therefrom, show that this was a crime conceived in robbery and born a murder. Appellant lived in Florida and he contacted his brother, John Lewis Jacobs, in Cullman, Alabama, to ascertain if he knew where he could get some money. Receiving an affirmative answer appellant left Florida with a .22 caliber rifle and came to the home of his sister in Brighton, Alabama, where he met his brother and Thomas Eugene Brown. Appellant was informed that the deceased was known to carry large sums of money on his person at all times. Appellant sawed off the stock and a part of the barrel of a semi-automatic rifle thereby converting it into a single shot weapon. On July 17, 1976, this trio stalked the deceased like a jackal would stalk a wounded deer until they enticed him into appellant's automobile which was driven by John Lewis Jacobs, under the guise of carrying him to his home to play cards. Instead of taking the deceased home they carried him from Cullman County into Blount County. On the trip to Blount County appellant pointed the sawed-off weapon at the deceased and threatened to kill him if he made a move. With the weapon still pointed at this seventy-nine year old man, appellant took his billfold from his pocket and removed other items of personal property from his person to help conceal his identification. They carried him to an abandoned highway near a wooded area and stopped the car. Appellant ordered the deceased to take off his shoes and give them to him. He then ordered him out of the car and took him by his arm and led him into the woods and near a creek where appellant then struck him in his face with such force that his *634 jawbone was broken into halves and he also broke one of his ribs. Though deceased was begging and pleading for his life, appellant fired one bullet into the back of the head of this helpless man and after he fell on the bank of the creek appellant reloaded the weapon and at close range he pumped another bullet into the back of his head. After killing this seventy-nine year old man appellant returned to the car wiping blood off his hands. He got in the car and because his shoes were wet from standing in the creek he put on the shoes he had forced the deceased to give him before the deceased was forced to walk "the last mile." The trio left the murder scene and disposed of all incriminating evidence all the way from where he had killed the deceased to a place about twelve miles south of Meridian, Mississippi. It was at this place that appellant threw the death weapon into some water in a swampy place. En route appellant divided the money he had robbed from the deceased with his brother.
They left the deceased in a jungle where the scavengers and vultures could devour his body and pick his bones. This was one of the most brutal, "conscienceless and pitiless" crimes in the annals of human depravity and evidenced a cold stone heart. It is a sad commentary upon the very name of civilization of the ease with which human beings can be turned into beasts.
The aggravating circumstances found by the trial court are amply supported by the evidence in this case. The verdict of the jury is overwhelmingly sustained by a preponderance of the evidence.
We hold the new Death Statute of this State is constitutional under both the Eighth and Fourteenth Amendments to the Constitution of the United States, and the judgment of conviction is, in all things, affirmed.
We will not fix the date of execution until this case runs its course through the courts.
AFFIRMED.
All the Judges concur.
TYSON, P. J., and BOOKOUT, J., filed separate concurring opinions.

APPENDIX

ARTICLE 5B.
 Sentence of Death or Life Imprisonment Without Parole.
Sec.
342(3). Limitation on imposition.
342(4). Aggravated offenses for which
 death penalty to be imposed;
 felony-murder doctrine not to
 be used to supply intent; discharge
 of defendant upon finding
 of not guilty; mistrials;
 reindictment after mistrial.
342(5). Hearing as to imposition of death
 penalty or life sentence without
 parole after conviction; admissibility
 of evidence; right of
 state and defendants to present
 arguments.
342(6). Determination of sentence by
 court; court not bound by punishment
 fixed by jury.
342(7). Conviction and sentence of death
 subject to automatic review.
342(8). Aggravating circumstances.
342(9). Mitigating circumstances.
342(10). Appointment of experienced counsel
 for indigent defendants.
342(11). Effective date.
§ 342(3). Limitation on imposition. Except in cases enumerated and described in section 342(4) of this title, neither a court nor a jury shall fix the punishment for the commission of treason, felony, or other offenses at death, and the death penalty or a life sentence without parole shall be fixed as punishment only in the cases *635 and in the manner herein enumerated and described in section 342(4) of this article. In all cases where no aggravated circumstances enumerated in section 342(4) of this title are expressly averred in the indictment, the trial shall proceed as now provided by law, except that the death penalty or life imprisonment without parole shall not be given, and the indictment shall include all lesser offenses. (1975, No. 213, § 1, effective March 7, 1976).
§ 342(4). Aggravated offenses for which death penalty to be imposed; felony-murder doctrine not to be used to supply intent; discharge of defendant upon finding of not guilty; mistrials; reindictment after mistrial.If the jury finds the defendant guilty, they shall fix the punishment at death when the defendant is charged by indictment with any of the following offenses and with aggravation which must also be averred in the indictment, and which offenses so charged with said aggravation shall not include any lesser offenses:
(a) Kidnapping for ransom or attempts thereof, when the victim is intentionally killed by the defendant.
(b) Robbery or attempts thereof when the victim is intentionally killed by the defendant.
(c) Rape when the victim is intentionally killed by the defendant; carnal knowledge of a girl under 12 years of age, or abuse of such girl in an attempt to have carnal knowledge, when the victim is intentionally killed by the defendant.
(d) Nighttime burglary of an occupied dwelling when any of the occupants is intentionally killed by the defendant.
(e) The murder of any police officer, sheriff, deputy, state trooper, or peace officer of any kind, or prison or jail guard, while such prison or jail guard is on duty, or because of some official or job-related act or performance of such officer or guard.
(f) Any murder committed while the defendant is under sentence of life imprisonment.
(g) Murder in the first degree when the killing was done for a pecuniary or other valuable consideration, or pursuant to a contract or for hire.
(h) Indecent molestation, or an attempt to indecently molest a child under the age of 16 years, when the child victim is intentionally killed by the defendant.
(i) Wilful setting off or exploding dynamite or other explosive under circumstances now punishable by Title 14, section 123 or 124, Code of Alabama 1940, when a person is intentionally killed by the defendant because of said explosion.
(j) Murder in the first degree wherein two or more human beings are intentionally killed by the defendant by one or a series of acts.
(k) Murder in the first degree where the victim is a public official or public figure, and the murder stems from or is caused by or related to his official position, acts, or capacity.
(l) Murder in the first degree committed while defendant is engaged or participating in the act of unlawfully assuming control of any aircraft by use of threats or force with intent to obtain any valuable consideration for the release of said aircraft or any passenger or crewman thereon, or to direct the route or movement of said aircraft, or otherwise exert control over said aircraft.
(m) Any murder committed by a defendant who has been convicted of murder in the first or second degree in the twenty years preceding the crime.
(n) Murder when perpetrated against any witness subpoenaed to testify at any preliminary hearing, trial or grand jury proceeding against the defendant who kills or procures the killing of witness, or when perpetrated against any human being while intending to kill such witness.
Evidence of intent under this section shall not be supplied by the felony-murder doctrine.
In such cases, if the jury finds the defendant not guilty, the defendant must be discharged. The court may enter a judgment of mistrial upon failure of the jury to *636 agree on a verdict of guilty or not guilty or on the fixing of the penalty of death. After entry of a judgment of mistrial, the defendant may be tried again for the aggravated offense, or he may be reindicted for an offense wherein the indictment does not allege an aggravated circumstance. If the defendant is reindicted for an offense wherein the indictment does not allege an aggravated circumstance, the punishment upon conviction shall be as heretofore or hereafter provided by law, however the punishment shall not be death or life imprisonment without parole. (1975, No. 213, § 2, effective March 7, 1976).
§ 342(5). Hearing as to imposition of death penalty or life sentence without parole after conviction; admissibility of evidence; right of state and defendants to present arguments.If the jury finds the defendant guilty of one of the aggravated offenses listed in section 342(4) hereof and fixes the punishment at death, the court shall thereupon hold a hearing to aid the court to determine whether or not the court will sentence defendant to death or to life imprisonment without parole. In the hearing evidence may be presented as to any matter that the court deems relevant to sentence, and shall include any matters relating to any of the aggravating or mitigating circumstances enumerated in sections 342(8) and 342(9) of this article. Any such evidence which the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements; and further provided that this section shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the state of Alabama. The state and the defendant, or his counsel, shall be permitted to present argument for or against the sentence of death. (1975, No. 213, § 3, effective March 7, 1976).
§ 342(6). Determination of sentence by court; court not bound by punishment fixed by jury.Notwithstanding the fixing of the punishment at death by the jury, the court after weighing the aggravating and mitigating circumstances may refuse to accept the death penalty as fixed by the jury and sentence the defendant to life imprisonment without parole, which shall be served without parole; or the court after weighing the aggravating and mitigating circumstances, and the fixing of the punishment at death by the jury, may accordingly sentence the defendant to death. If the court imposes a sentence of death, it shall set forth in writing as the basis for the sentence of death, findings of fact from the trial and the sentence hearing which shall at least include the following:
(a) One or more of the aggravating circumstances enumerated in section 342(8) of this title, which it finds exists in the case and which it finds sufficient to support the sentence of death, and
(b) Any of the mitigating circumstances enumerated in section 342(9) of this title which it finds insufficient to outweigh the aggravating circumstances. (1975, No. 213, § 4, effective March 7, 1976.)
§ 342(7). Conviction and sentence of death subject to automatic review. The judgment of conviction and sentence of death shall be subject to automatic review as now required by law. (1975, No. 213, § 5, effective March 7, 1976).
§ 342(8). Aggravating circumstances. Aggravating circumstances shall be the following:
(a) The capital felony was committed by a person under sentence of imprisonment;
(b) The defendant was previously convicted of another capital felony or a felony involving the use or threat of violence to the person;
(c) The defendant knowingly created a great risk of death to many persons;
(d) The capital felony was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, rape, robbery, burglary, or kidnapping for ransom;
*637 (e) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;
(f) The capital felony was committed for pecuniary gain;
(g) The capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws;
(h) The capital felony was especially heinous, atrocious or cruel. (1975, No. 213, § 6, effective March 7, 1976).
§ 342(9). Mitigating circumstances. Mitigating circumstances shall be the following:
(a) The defendant has no significant history of prior criminal activity;
(b) The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance;
(c) The victim was a participant in the defendant's conduct or consented to the act;
(d) The defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor;
(e) The defendant acted under extreme duress or under the substantial domination of another person;
(f) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired;
(g) The age of the defendant at the time of the crime. (1975, No. 213, § 7, effective March 7, 1976).
§ 342(10). Appointment of experienced counsel for indigent defendants.Each person indicted for an offense punishable under the provisions of this article who is not able to afford legal counsel must be provided with court appointed counsel having no less than five years' prior experience in the active practice of criminal law. (1975, No. 213, § 8, effective March 7, 1976).
§ 342(11). Effective date. This article shall become effective one hundred and eighty (180) days from the date which the governor affixes his signature thereto [March 7, 1976]. (1975, No. 213, § 10, effective March 7, 1976).
BOOKOUT, Judge, concurring specially:
I concur in the result of the majority opinion. The death penalty is not only supported by popular opinion in this state, but it finds acceptance in the legal history of both this country and England. See: Gregg v. Georgia, supra. The imposition of capital punishment is constitutionally permissible within the limitations expressed by the United States Supreme Court in Gregg, Jurek and Proffitt, supra. Its imposition is impermissible under the circumstances enumerated in Furman, Woodson, Roberts, supra; Gardner v. Florida (1977) 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393; and, Roberts v. Louisiana (1977) 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637.
Aside from arguments, pro and con, as to the deterrent effect of capital punishment, it is looked upon by many as a means of ridding society of its "mad dogs." From the constant flow of cases reaching this Court since Furman, supra, evincing the most savage, inhumane, animalistic and sadistic mutilations and murders, it is increasingly apparent that society must do something with its mad dogs other than give them food and lodging for a number of years and then turn them loose upon the public once again. Aside from the deterrent effect capital punishment may have on future criminals, it can be said with certainty that execution deters, for all time, the criminal conduct of the person against whom it is imposed.
The United States Supreme Court, through its decisions, appears to have established a constitutional policy that the death penalty may be imposed only in the grossest cases of human depravity and then only under a strict set of procedures designed to safeguard due process and equal protection. The new death penalty statute of Alabama may or may not pass constitutional muster when it is inevitably reviewed by the highest *638 court. It would not be surprising if it did not; however, in the absence of a clear-cut decision by that Court, "on all fours" with our statute, it is our duty to give acts of the legislature a favorable constitutional construction. Central of Georgia Railroad Company v. Groesbeck & Armstrong, 175 Ala. 189, 57 So. 280 (1912); 16 C.J.S. Constitutional Law, § 99.
Though valid in our opinion, the act has some weaknesses. It has been aptly termed as the "Kill `em or let `em go free act." The jury hears no aggravating or mitigating circumstances in reaching one of two possible verdicts: (1) complete acquittal, or (2) death. If the jury finds the defendant guilty, it must fix the punishment at death. The trial judge must then consider aggravating and mitigating circumstances and either: (1) sentence the defendant to death, or (2) "refuse to accept the death penalty as fixed by the jury and sentence the Defendant to life imprisonment without parole.. . ."
The death penalty statutes upheld in Georgia, Florida and Texas all required the jury to consider mitigating and aggravating circumstances. Alabama places this responsibility upon the trial judge. Since our type system has not been held to be invalid, it will stand until the United States Supreme Court finds it to be constitutionally repugnant.
Another problem area, brought out on oral argument on this and a companion case, is the impact the limited choice of verdicts has upon a jury venire. Many veniremen, when questioned, will answer that if they determine the accused to be guilty of any degree of murder, they could not vote to acquit. Some will say that they will not acquit if they determine the accused to be guilty of any offense. On the other hand, some will say that they could not impose the death penalty, but would impose a lesser punishment if it was available to the jury. Such a stark choice confronting the venire would make the selection of a fair and impartial jury very difficult, but not impossible.
Likewise, the wording of the aggravating and mitigating circumstances enumerated in the Alabama act is subject to misconstruction in some instances. I do not agree with the interpretation placed upon one of the aggravating circumstances set out in the trial court's order. The trial judge found as an aggravating circumstance that the capital felony was committed for the purpose of avoiding or preventing a lawful arrest. While the killing of a potential witness may indirectly aid a defendant in avoiding an arrest, I do not believe the legislature intended such construction. That section of the act reads as follows:
"(e) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody."
That section speaks of avoiding or preventing a lawful arrest or effecting an escape from custody. That wording was added to the act to protect peace officers. It is to deter "shoot outs" with arresting officers, or in escapes after arrests. The words "lawful arrest" are significant in that a person in Alabama may resist, with force, an unlawful arrest. Green v. State, 238 Ala. 143, 189 So. 763 (1939). When coupled with the phrase referring to escapes from custody, it is apparent that the legislature was attempting to protect officers of the law rather than potential identification witnesses. If protecting potential witnesses was the intent of that section, the legislature would merely have said that killing a potential witness would be an aggravating circumstance.
Although I believe the trial judge misconstrued that subsection, he committed no prejudicial error because the sentence may be supported by any one or more of the aggravating circumstances enumerated. The fact that the offense of first degree murder was committed by the appellant while engaged in the robbery of the victim, is alone sufficient to support the sentence.
There is one other aggravating circumstance, listed in the order of the trial court, which should be given a careful consideration by trial judges in future cases. That *639 circumstance is that the offense was "especially heinous, atrocious or cruel." Under the definition set out by the Supreme Court of Florida in State v. Dixon, supra, not only the instant murder could be considered as aggravated, but almost any non-accidental shooting could be so classified. The instant murder, though by far not the most depraved that has reached this Court, does fall within the aggravating circumstance of being heinous, atrocious or cruel. The killing, while not inflicting a "high degree of pain," or unusual suffering, could be deemed "extremely wicked," or "vile" under the peculiar circumstances of this case. It should also be noted that the facts of the homicide in the instant case are almost identical to those in Gregg v. Georgia, supra, wherein the death penalty was affirmed. I therefore concur with the majority that the conviction and sentence should be affirmed. The guilt of the accused was proved beyond any doubt. The punishment fits the crime.
TYSON, Presiding Judge, concurring.
I concur in the opinion prepared in this cause by my brother, Judge Harris.
Title 15, Section 342(7), Code of Alabama 1940, as amended 1975 (Act No. 213, Acts of Alabama 1975, Regular Session), provides for and requires automatic review of death sentences by this court.
Being a court of statewide jurisdiction, this court is required to weigh the evidence and to consider any aggravating circumstances (Title 15, Section 342(8), Code of Alabama 1940, as amended 1975), or mitigating circumstances (Title 15, Section 342(9), Code of Alabama 1940, as amended 1975), the mitigating circumstances being as follows:
"(a) The defendant has no significant history of prior criminal activity;
"(b) The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance;
"(c) The victim was a participant in the defendant's conduct or consented to the act;
"(d) The defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor;
"(e) The defendant acted under extreme duress or under the substantial domination of another person;
"(f) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired;
"(g) The age of the defendant at the time of the crime."
The record before us does not reveal any racial, religious, or ethnic overtones, nor was such averred or argued in this court. The trial judge found no mitigating circumstances in his consideration of the record, and this court finds none (See the principal opinion of this court in this case.).
We are aware that the statutes in Texas (Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929), and in Georgia (Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859), provide for a second jury to consider the question of mitigating or aggravating circumstances, as does Florida (Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913).
However, Alabama, similarly to Florida, vests the absolute authority in the trial judge to weigh the aggravating and mitigating circumstances in a separate hearing, with the discretion to refuse to accept the death penalty, as may be determined by the trial jury (Title 15, Section 342(6), Code of Alabama 1940, as amended 1975). Judge Harris points this out in his opinion also.
This court has not been cited to any authority which requires two separate and distinct juries to determine both the guilt or innocence on the one hand, and the issue of punishment on the other, though such systems were approved in the Georgia and Texas cases.
It is my opinion that the distinguishing feature, which makes the Alabama statute constitutionally sound, is that a trial judge in Alabama fixes the punishment and is not bound by the trial jury's determination (Title *640 15, Section 342(6), Code of Alabama 1940, as amended 1975).
The aggravating circumstances were here averred and proved at trial, and also determined by the trial judge in a separate hearing, as required by statute. Such procedure accords the appellant full protection of his constitutional rights. I therefore join in the opinion prepared by my able brother, Judge Harris, in affirming this cause.